# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALIAN ASENCIO, ARACELIS VELEZ CRUZ, DENISE NIEVES, YARITZA DE JESUS LOPEZ, ROSA RIVERA, ANGEL LAURIANO MUÑOZ DE JESUS, BETHZAIDA CRESPO VICENTE, and IRIS OTERO, on behalf of themselves and all similarly situated individuals<br><br>Plaintiffs,<br><br>-against-<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, WILLIAM BROCK LONG, THOMAS VAN ESSEN, and ALEJANDRO DE LA CAMPA,<br><br>Defendants. | CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT <u>SEEKING INJUNCTIVE AND DECLARATORY RELIEF</u>**<br><br>ECF Case |

1.       Plaintiffs Alian Asencio, Aracelis Velez Cruz, Denise Nieves, Yaritza de Jesus Lopez, Rosa Rivera, Angel Lauriano Muñoz de Jesus, Bethzaida Crespo Vicente, and Iris Otero (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this complaint against the Federal Emergency Management Agency ("FEMA"), William Brock Long, Thomas Van Essen, and Alejandro De La Campa, on behalf of themselves and all similarly situated individuals.

## I.

## <u>PRELIMINARY STATEMENT</u>

2.       This is an action to (a) hold unlawful and set aside certain agency actions of the Federal Emergency Management Agency ("FEMA"), the federal agency charged by statute to care for Americans who are victims of natural disasters; and (b) compel FEMA to take other

action that it has unlawfully withheld or unreasonably delayed.  Contrary to its charge, FEMA is planning to prematurely abort its assistance to thousands of Puerto Ricans displaced by Hurricane Maria.  FEMA has announced that on June 30, 2018, it will arbitrarily, capriciously, and unlawfully discontinue its Transitional Shelter Assistance ("TSA"), which provides direct funding to hotels and motels, which serve as shelters for thousands of individuals and families who were forced to evacuate the island of Puerto Rico because the hurricane severely damaged or destroyed their homes.  FEMA's refusal to extend TSA is without *any* plan for transitioning into longer-term housing some 2,000 individuals who have already faced severe trauma and lost most, if not all, of their belongings, their homes and their jobs.  For Plaintiffs and many other TSA evacuees, especially the poor, elderly and sick, returning to their homes (or what is left of their homes) in Puerto Rico is not a viable option.

3.     Through the TSA program, hotels and motels across the mainland United States have become the temporary homes of these evacuees, who, as of June 30, 2018, will become homeless.  By discontinuing the TSA program, FEMA is knowingly withholding desperately needed support to these marginalized American citizens, putting TSA evacuees at risk of homelessness and other irreparable injury.  Indeed, the evacuees will be ripped from their homes yet again—not by a natural disaster, but by a manmade one created by the federal agency charged with disaster relief.

4.     This action, therefore, is brought by eight named plaintiffs, on their own behalf and on behalf of a class of people similarly situated, seeking an order that FEMA obey the laws put into place to address the problems associated with disasters such as Hurricane Maria, and continue FEMA's TSA program until all eligible individuals have either received temporary housing assistance or found alternative, permanent housing.

5.      Plaintiffs seek a judicial declaration and injunctive relief that under the Due Process Clause of the Fifth Amendment to the United States Constitution and Section 706 of the Administrative Procedures Act, each of which independently provides Plaintiffs with a right of action against FEMA and the individual defendants for each violation.  Defendants' conduct violates both the substantive and procedural components of the Due Process Clause and at least three provisions of the APA.

6.      First, Section 706(2)(B) of the APA requires courts to hold unlawful and set aside any agency action that is contrary to constitutional right, power, privilege or immunity.  Because Defendants' conduct violates due process, the Court must also hold such action unlawful and set it aside.

7.      Second, Section 706(2)(A) of the APA requires courts to hold unlawful and set aside any agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Defendants' decision to terminate TSA to thousands of evacuees without any plan to transition evacuees into longer-term housing is arbitrary and capricious.  It simply has no basis in fact.

8.      Third, Section 706(1) of the APA requires courts to compel agency action where such action has been unlawfully withheld or unreasonably delayed.  Defendants have decided to terminate TSA on the one hand, while unreasonably delaying activation of any replacement housing assistance on the other hand.  They should be compelled to continue TSA until FEMA provides eligible evacuees sufficient Temporary Housing Assistance and implements an adequate replacement solution, or until Plaintiffs and class members have each been relocated into alternate housing.

9.      Plaintiffs seek such relief because it appears that, absent judicial oversight, the victimization of evacuees will continue.  Plaintiffs also seek an order compelling FEMA to provide additional housing assistance to TSA evacuees.

## II.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction in this action under 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (judicial review under APA).  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

11.      Venue in this Court is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## III.

## PARTIES

A.      **INDIVIDUAL PLAINTIFFS**

12.      Plaintiff ALIAN ACENSIO is a 35-year-old woman from San Juan, Puerto Rico. She relocated as a hurricane evacuee to Worcester, Massachusetts, in April 2018 with her spouse, Jose Rodriguez, who is 39 years old.  Both reside in a hotel under the TSA program.  Ms. Acensio and Mr. Rodriguez have no residence to return to in Puerto Rico.  Their home was flooded, their windows broken, and as of the time of their evacuation, they still lacked electricity and running water.  Ms. Acensio suffers from recurrent major depression, and Mr. Rodriguez suffers from schizophrenia and paranoia.  Mr. Rodriguez was unable to access the medical

services he needed in Puerto Rico and is seeking mental health and healthcare services in Massachusetts. They have no other family members with them or in Massachusetts, and if they are evicted from their temporary hotel room on June 30, 2018, they will be left homeless.

13.     Plaintiff ARACELIS VELEZ CRUZ is a 46-year-old woman from Canovanas, Puerto Rico. She relocated as a hurricane evacuee to Worcester, Massachusetts, in February 2018, where she currently resides in a hotel under the TSA program. She has no residence to return to in Puerto Rico as her home has flooded and remains without electricity or running water. Ms. Velez Cruz relocated as an evacuee due to her precarious living situation and the dearth of places to purchase food where she resided in Puerto Rico. Ms. Velez Cruz has no other family members in Massachusetts, and if she is evicted from her temporary hotel room on June 30, 2018, she will be left homeless.

14.     Plaintiff DENISE NIEVES is a 48-year-old woman from Toa Baja, Puerto Rico. She relocated as a hurricane evacuee to West Springfield, Massachusetts, in November 2017 with her son. Ms. Nieves and her son reside in a hotel under the TSA program. She has no residence to return to in Puerto Rico as her home has flooded and she was told by FEMA representatives that she would not receive any assistance to repair it. Her housing conditions became dangerous and she and her son were forced to leave their home. She stopped receiving income and used the remaining source of funds she had to purchase a ticket to Massachusetts. Ms. Nieves and her son both suffer from several medical conditions that make their pending homelessness even more dire. Her son, who was born prematurely, has on-going neurological dysfunctions, and suffers from Attention Deficit and Hyperactivity Disorder, as well as Post-Traumatic Stress Disorder. Ms. Nieves suffers from pulmonary hypertension, which affects the flow of oxygen to both her lungs and heart. She and her son have sought out medical attention in

Massachusetts.  Ms. Nieves and her child have no other family members with them or in Massachusetts.  Ms. Nieves does not own a vehicle.  If they are evicted on June 30, 2018, from their temporary hotel room, they will be left homeless.

15.     Plaintiff YARITZA DE JESUS LOPEZ is a 35-year-old woman from Caguas, Puerto Rico.  She relocated as a hurricane evacuee to West Springfield, Massachusetts, in February 2018 with her three children.  Ms. de Jesus Lopez and her children reside in a hotel under the TSA program.  She has no residence to return to in Puerto Rico as her home was completely destroyed from water and wind damage; the wind blew out the windows and the doors, water filled the home, and the roof was ripped off.  Ms. de Jesus Lopez's three children have serious asthma and sinus problems.  Ms. de Jesus Lopez and her children have no other family members with them or in Massachusetts, and if they are evicted from their temporary hotel room on June 30, 2018, they will be left homeless.

16.     Plaintiff ROSA RIVERA is a 57-year-old woman from San Juan, Puerto Rico. She relocated as a hurricane evacuee to Worcester, Massachusetts, in November 2017 with her adult daughter, Neisha Paulino.  Ms. Rivera and Ms. Pulino reside in a hotel under the TSA program.  Ms. Rivera has no residence to return to in Puerto Rico as her home has flooded and remains without electricity or running water.  Ms. Rivera continues to suffer from several medical conditions, and she receives medical attention in Massachusetts.  If Ms. Rivera and her daughter are evicted from their temporary hotel room on June 30, 2018, they will be left homeless.

17.     Plaintiff ANGEL LAURIANO MUÑOZ DE JESUS is a 69-year-old man who self-evacuated from Bayamon, Puerto Rico, to central Florida in November 2017, where he currently resides in a hotel under the TSA program.  Mr. Muñoz de Jesus suffers from panic

attacks and anxiety and was under supervision and continual care by his psychiatrist, who had an office in Toa Bajo, Puerto Rico.  His psychiatrist's office was rendered uninhabitable after Hurricane Maria, leaving Mr. Muñoz de Jesus without the necessary medical care to supervise his medications and conditions.  Mr. Muñoz de Jesus also suffers from emphysema, which requires breathing treatments, often several times a day.  He experiences headaches from an untreated eye condition, which will require surgery, in addition to mental health conditions such as stress and depression from the inability to secure permanent housing; no options have been made available to him.  Mr. Muñoz de Jesus' home in Puerto Rico lost electricity requiring him, in addition to his medical needs, to seek relocation to Florida.  Mr. Muñoz de Jesus is retired, elderly, and infirm and relies only on a Social Security stipend to pay for his living expenses.  If he is evicted on June 30, 2018, from his temporary hotel room, he will become homeless.

18.     Plaintiff BETHZAIDA CRESPO VICENTE is a 36-year-old woman who self-evacuated from Dorado, Puerto Rico, with her three children and husband on November 16, 2017.  Ms. Crespo Vicente and her family currently reside in a hotel under the TSA program in central Florida.  Ms. Crespo Vicente had rented a home in Puerto Rico, which was completely destroyed by Hurricane Maria.  As a result, she was forced to temporarily relocate to her mother-in-law's home, where nine people were living in a small house with no electricity.  Ms. Crespo Vicente's children could not attend school in Puerto Rico, which had been temporarily closed due to the impact of the hurricane.  Ms. Crespo Vicente suffers from manic depressive disorder, anxiety and scoliosis, for which she is awaiting surgery in Florida.  Ms. Crespo Vicente had to undergo emergency surgery in March 2018 to address a growth on her uterus.  Since her recent surgery, she stopped receiving public assistance because her mail was not being accepted at the extended-stay hotel where she and her family currently reside.  Ms. Crespo Vicente's husband is

working; however, they have not been able to earn sufficient income to pay the security deposit for an apartment or ensure they can adequately cover rental costs and transition into permanent housing.  Ms. Crespo Vicente's husband suffers from high blood pressure and stomach disorders, which require medical attention that he has sought in Florida.  The Crespo Vicente family has no other available housing options, and if they are evicted from their temporary hotel room on June 30, 2018, they will be left homeless.

19.     Plaintiff IRIS OTERO is a 39-year-old woman who self-evacuated from San Juan, Puerto Rico, with her five children after Hurricane Maria devastated the island.  Ms. Otero is a single mother who was living in public housing that was completely destroyed by the hurricane. Ms. Otero's landlord would not repair her apartment or the public housing building in Puerto Rico, which became infested with rats as the front door to her apartment was blown away during the hurricane.  Ms. Otero and her children currently reside in a hotel under the TSA program in central Florida.  Ms. Otero's three oldest children suffer from ADHD, a condition of diagnosed hyperactivity that requires ongoing psychological or psychiatric care and supervision.  Her children's schools in Puerto Rico were closed indefinitely.  Three of Ms. Otero's children have other learning disabilities, which makes it extremely difficult for her to relocate them again based on their educational needs and the level of care required for their growth and well-being. She has no assistance or support in Puerto Rico to help her re-establish herself and her children there, as her mother is elderly and suffers from several medical conditions.  Ms. Otero has not received public assistance in Florida and cannot afford to move to more permanent housing.  Ms. Otero feels desperate and scared and has suffered from insomnia and stress at the prospect of finding herself and her five children homeless.  Ms. Otero and her children have no other

available housing options, and if they are evicted from their temporary hotel room on June 30, 2018, they will be left homeless.

**B.    CLASS PLAINTIFFS**

20.    Plaintiffs bring this action on their own behalf and on behalf of all those similarly situated.

21.    Plaintiffs seek to represent a class consisting of all persons who (a) as of September 16, 2017, resided in Puerto Rico, declared to be a Federal Disaster Area due to Hurricane Maria; (b) have applied for and received TSA under the Stafford Act, pursuant to 42 U.S.C. § 5174(a) through (d) and the federal regulations promulgated thereunder; (c) are currently residing in TSA housing; (d) have not been able to secure alternative housing; and (e) will have their TSA discontinued as of June 30, 2018.

22.    Each of the requirements of Federal Rule of Civil Procedure 23(a) is met.

23.    Members of the class are so numerous that joinder of all members is impracticable, and individual litigation by each would necessarily and substantially burden the operation of the judicial system and is prohibitive because the individual class members lack the knowledge, sophistication, and financial means to maintain individual actions.  In addition, the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications establishing incompatible rules of law for the provision of disaster relief.

24.    The number of class members can best be estimated from records in the control of Defendants.  They are believed to number in the thousands.

25.    There is a well-defined community of interest in the questions of law and fact involving the claims of the members of the class, in that FEMA has systemically applied the

policies and practices challenged in this action to wrongfully and arbitrarily discontinue the TSA program under the Stafford Act before evacuees have secured alternative housing.  There are common questions of law or fact.

26.     The claims of the named plaintiffs are typical of the class members in that each named plaintiff, due to the challenged policies and practices of FEMA: (a) has been displaced by Hurricane Maria and/or had their primary pre-disaster residence rendered uninhabitable; (b) is currently receiving TSA; and (c) will be displaced as of June 30, 2018 if FEMA discontinues TSA as it threatens to do.

27.     The named plaintiffs will adequately and fairly represent and protect the interests of the class because each named plaintiff has suffered the same or similar harm, and has the same or similar interest in redress of his/her rights as all other members of the class, and thus their interests overlap and do not conflict.  The attorneys representing Plaintiffs, Hector E. Pineiro, Manatt, Phelps, & Phillips, LLP and LatinoJustice PRLDEF are experienced and capable litigators possessed of sufficient resources to adequately protect and represent the interests of the plaintiff class.

28.     The requirements of Federal Rule of Civil Procedure 23(b)(2) are met in that the regulations, practices, and procedures which are the subject of this lawsuit have been applied to the members of the class as a whole, and Defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.  A class action is the exclusive method by which the interests of all affected persons can be adequately protected.

### C.   DEFENDANTS

29.    Defendant Federal Emergency Management Agency was created in 1979 as a result of the merging of several federal agencies that handled disaster-related responsibilities. FEMA is the federal agency designated by the President to administer the Temporary Housing Assistance ("THA") program in accordance with the provisions of the Stafford Act and the federal regulations.  As an agency of the federal government, FEMA's actions are directed and carried out by other agencies and individuals.  When used in this Complaint, the acronym "FEMA" shall be understood to refer not only to that agency, but to the Defendants listed below as well.

30.    Defendant Willian Brock Long has been the Director of FEMA from June 20, 2017, through the present.

31.    Defendant Thomas Van Essen is the FEMA Regional Director with administrative responsibility for FEMA's response to Hurricane Maria victims from Puerto Rico.

32.    To coordinate the federal government's efforts in response to a disaster, FEMA recommends, and the President appoints, a Federal Coordinating Officer ("FCO") for each state affected by a disaster.  Defendant Alejandro De La Campa is the FCO with overall responsibility for FEMA's response to Hurricane Maria in Puerto Rico.

## IV.

## BASIS FOR RELIEF

33.    This action and the relief requested are authorized under 28 U.S.C. § 1361, 28 U.S.C. § 2201, 28 U.S.C. § 2202, 28 U.S.C. § 2412(b), 42 U.S.C. §§ 5151, 5174, and 5 U.S.C. §§ 701 et seq. and the federal regulations promulgated thereunder, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

34.     Under the Stafford Act, victims of a disaster are eligible for "financial or other assistance" to meet their housing needs if they have been "displaced from their pre-disaster primary residences," or their pre-disaster primary residences "are rendered uninhabitable as a result of damage caused by a major disaster." 42 U.S.C. § 5174(b)(1).

35.     42 U.S.C. § 5170b(a)(3)(B), also known as the Stafford Act's "public assistance" provision, gives FEMA the power to perform "work or services essential to saving lives and protecting and preserving property or public health and safety, including . . . emergency shelter . . ." Under this authority, FEMA provides short-term Transitional Sheltering Assistance to disaster survivors who cannot return to their homes after congregate shelters have closed. In most cases, assistance is provided through direct payments to hotels and motels.

36.     Under the Stafford Act, victims of a disaster are eligible for Temporary Housing Assistance. THA is available for 18 months from the date that the President declared a disaster, but may be extended beyond that time. 44 C.F.R. § 206.110(e).

37.     There are four forms of THA: (1) money for renting alternate housing ("Direct Rental Assistance"), (2) rent-free occupancy in federally provided temporary housing, (3) money for repair of owner-occupied housing, and (4) money for replacement of owner-occupied housing. 42 U.S.C. § 5174(c); 44 C.F.R. § 206.117(b).

38.     Applications for THA, and for the distribution of federal benefits pursuant to the Stafford Act, must be done in "an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status." 42 U.S.C. § 5151 0.(a).

39.     On September 18, 2017, President Donald J. Trump declared a state of emergency in the Commonwealth of Puerto Rico. President Trump's declarations required FEMA to

provide assistance under the Stafford Act.  FEMA's duty to provide assistance to victims of Hurricane Maria was mandatory, not discretionary.

**V.**

**SUMMARY OF FACTS**

**A.    HURRICANE MARIA RAVAGES PUERTO RICO**

40.    On September 20, 2017, Hurricane Maria hit the Caribbean island of Puerto Rico, a territory of the United States with 3.4 million residents.  The hurricane, classified as a Category 5 storm, was the worst natural disaster in Puerto Rico in over a hundred years, crippling the island's infrastructure and causing an estimated $90 billion in damage.

41.    Hurricane Maria devastated the electrical grid, causing a one-hundred percent blackout in Puerto Rico and leaving hundreds of thousands of residents without power for months.  Currently, ten months after the hurricane hit the island, there are still thousands of residents whose electricity has not yet been restored.

42.    The hurricane severely, if not permanently, damaged tens of thousands of homes and left nearly 75,000 Puerto Ricans without housing.

43.    Many municipalities throughout the island were without potable water, or any kind of running water, for weeks or months at a time, creating a public health hazard and concern for healthcare and nutritional assistance for all residents.

44.    As a result of the lack of drinking water, combined with contaminated sources of water that residents were told were safe for drinking, cases of leptospirosis, a potentially deadly bacterial disease that is water-borne, began to break out, putting at risk up to two million residents of Puerto Rico.

45.     The lack of electricity and infrastructure damage extended to healthcare facilities and hospitals; most were running on generators, and some had no electricity even by generators. Residents were told not to seek out healthcare services unless it was an emergency, given the lack of medical equipment, personnel, facilities in a condition to tend to patients, and electricity.

46.     It is estimated that the lack of available and accessible healthcare services, electricity, food, and drinking water, in addition to widespread environmental and water contamination, dangerous housing conditions, broken infrastructure, damaged roads, and centralization of aid led to the deaths of approximately 4,645 Puerto Ricans, and perhaps thousands more.

47.     Since the hurricane, Puerto Rico has seen a steep increase in the number of suicides and mental health issues, including post-traumatic stress disorder.

48.     As a result of the damage inflicted on Puerto Rico by Hurricane Maria, thousands of Puerto Ricans became displaced and sought assistance on the mainland United States.  It is estimated that between 100,000 and 300,000 Puerto Ricans left the island in the months following the hurricane to seek stable housing, employment and healthcare services.

49.     Evacuees are spread out across the country, with the highest concentration in Florida, particularly central Florida, as well as in the New York City metropolitan and tri-state area, Philadelphia, Chicago, Boston, Pennsylvania, and elsewhere throughout the United States.

50.     Many evacuees are families or single parents with children, who have already been enrolled in local schools.  Some of the evacuees are elderly individuals who have arrived by themselves, with no family support or alternative housing options.

**B.     FEMA PROVIDES TRANSITIONAL SHELTER ASSISTANCE TO EVACUEES**

51.     Among the displaced Puerto Rican evacuees, about 2,300 families began receiving TSA from FEMA (hereinafter referred to as "TSA evacuees"), which included vouchers for extended stays in hotels around the country or in temporary housing facilities, although some were denied these benefits outright.  Many of the households that initially received TSA were later cut off.  Approximately 2,000 families continue to participate in the TSA program.  Many thousands more left the island and likely found family members, friends, or acquaintances to stay with, even if temporarily.  Others have ended up directly in homeless shelter systems throughout various states.

52.     The TSA program was extended at least three times in order to avoid massive secondary displacement of TSA evacuees, the overwhelming majority of whom have not been able to secure employment or long-term housing.

53.     Prior to each extension, individuals and families participating in the TSA program experienced anxiety and high levels of uncertainty about what would happen to them, given that most had not been successful in securing longer-term housing or employment.

**C.     FEMA PLANS TO DISCONTINUE TSA ON JUNE 30, 2018, LEAVING EVACUEES HOMELESS**

54.     The current TSA program for victims of Hurricane Maria is scheduled to permanently expire on June 30, 2018, and FEMA has stated that it will not consider a further extension.

55.     Hundreds of families are still in hotels under TSA, unsure where they will go on June 30, 2018.  Unable to secure alternative longer-term housing solutions, they will likely end up in homeless shelters, return to precarious housing and employment situations in Puerto Rico,

or worse—living on the street.  Families currently under the TSA program have requested an extension from FEMA.

56.    There are approximately 2,000 TSA evacuees throughout the United States, including Plaintiffs, who (a) were displaced from their homes by Hurricane Maria, (b) were given a voucher by FEMA to seek lodging in a hotel, (c) have remained in the TSA program until the present time with FEMA paying for their temporary hotel residences, (d) are still unable to either return to their previous homes or secure adequate alternative permanent housing, and (e) have reasonably relied, in making long-term housing plans, on the expectation that FEMA would continue to support them with the TSA program until they can either return to their homes or find other sustainable permanent housing.

57.    While receiving federal assistance from FEMA, most TSA evacuees are ineligible for local benefits and housing assistance.  If TSA assistance to these hurricane victims is revoked, they will become homeless.

58.    TSA evacuees have no other housing options open to them.  They do not have family members with whom they can stay, and they cannot return to Puerto Rico because there are no housing options for them.  Most have lost their jobs and have no source of employment to go back to.  In addition, many, including Plaintiffs, left Puerto Rico to seek healthcare for conditions they had that became aggravated as a result of lack of proper medical attention in Puerto Rico after the hurricane, and others have developed serious conditions or illnesses since their arrival.  They need to remain in their current location, where they can continue to receive treatment and care for illnesses that include cancer, hypertension, diabetes, and asthma.

59.     If the remaining 2,000 TSA evacuees are evicted on June 30, 2018, and no local or state government programs are immediately put in place to secure stable housing for them, they will become homeless and suffer irreparable injury.

60.     Upon information and belief, Plaintiffs and putative class members have been actively working to secure permanent or longer-term housing.

61.     There are several ways in which FEMA can ensure that evacuees whose TSA is terminated on June 30, 2018 are not left homeless.

62.     FEMA has the ability to enter into an Inter-Agency Agreement (IAA) with the Department of Housing and Urban Development (HUD) to initiate the Disaster Housing Assistance Program (DHAP), as they did after Hurricane Katrina and Hurricane Sandy.  FEMA has represented that "DHAP is not necessary to house displaced disaster survivors" because "FEMA collaborates directly with HUD to find housing solutions for disaster survivors and is providing a variety of housing programs to adequately meet the unique needs of survivors that are more timely and effective than DHAP."  *See* FEMA Media Library (May 3, 2018), *available at* https://www.fema.gov/media-library/assets/images/163928 (last accessed June 29, 2018). FEMA has not kept this promise.

63.     FEMA also has the ability to extend Direct Rental Assistance to all of the TSA evacuees in order to help them secure longer-term housing options, including apartment leases that would allow them to contract housing for longer periods of time.  As of now, and upon information and belief, this program has been extended to only approximately 83 TSA evacuees. Some evacuees have applied for THA, but have not received it.

64.     FEMA has arbitrarily, capriciously, and unlawfully set the final TSA deadline for June 30, 2018, without a plan for transitioning into longer-term or long-term housing some 2,000

individuals who have faced severe trauma and who have lost most, if not all, of their belongings, their homes, and their jobs and who face healthcare challenges.  Hotels have begun to receive notification that FEMA will no longer continue to pay for Plaintiffs and all TSA evacuees' stays as of June 30, 2018, and many hotels have sent notices to the evacuees that they will be responsible for payment as of July 1, 2018.  TSA evacuees and Plaintiffs are terrified at the possibility of being evicted with no alternative housing options available.

65.     This litigation seeks to stop the eviction of TSA evacuees from their hotels without any alternative housing.

66.     FEMA has currently offered TSA assistance to victims of Hurricane Maria for only the past nine months.  However, after Hurricanes Katrina and Rita, FEMA extended TSA assistance for up to 26 months for evacuees.  After that, FEMA provided additional assistance to the victims of Hurricanes Katrina and Rita through DHAP.  FEMA has arbitrarily, capriciously, and unlawfully decided not to extend those same benefits to Plaintiffs and the putative class.

67.     If evicted on June 30, 2018, as FEMA has stated its intent to do, Plaintiffs and the putative class would suffer irreparable injury.

**D.     DEFENDANTS' CONDUCT HAS AND WILL PROXIMATELY CAUSE IRREPARABLE HARM TO PLAINTIFFS, CLASS MEMBERS AND THE PUBLIC.**

68.     Defendants' wrongful conduct has caused and will continue to cause Plaintiffs and class members irreparable harm and injury in that, absent judicial relief, they will be wrongfully denied and delayed essential housing assistance that is necessary for their health and welfare.

69.     Without that housing assistance, Plaintiffs, class members, and their families will be unable to remain continuously in affordable housing and will face the threat of probable homelessness.

70.     Many Plaintiffs, class members, and their families have been forced to live in intolerable, unsafe and unsanitary conditions as a result of Hurricane Maria and inadequate disaster relief, which has caused new medical conditions and complicated existing medical conditions.  Without the requested relief, many others will also be forced to live in those same intolerable, unsafe and unsanitary conditions.

71.     Many Plaintiffs, class members, and their families, have been displaced and evacuated to distant places around the country, often by FEMA, and left without housing assistance and the means to return to their communities.

72.     The lack of housing assistance for Plaintiffs, class members, and their families has also served to split families and tear households apart.

73.     Defendants' knowing and continued failure and refusal to provide housing assistance to thousands of individuals and families, who will be evicted from their current TSA shelters, is causing, and will likely continue to cause, further destitution, homelessness, hunger and stress.  As a consequence, the risk of illness will be increased and their lives will be endangered.

74.     Defendants' intentional and wrongful conduct will also result in significant costs to the public and waste of taxpayer funds.  The loss of critically needed housing assistance harms those communities which have been destroyed by Hurricane Maria. The loss of housing assistance will harm many other communities throughout the country which have reached out to assist those who have been displaced and evacuated and now will face increased homelessness

and, consequently, a higher incidence of persons with mental and emotional distress, illness, diseases, and substance abuse.

75.     As a result of the federal government's failure to fulfill its mandatory duties, misconduct, state and local governments will be required to expend significant additional funds for the increased use of county health facilities to remedy these increased problems.

**E.  PLAINTIFFS AND CLASS MEMBERS HAVE NO ADEQUATE REMEDY AT LAW.**

76.     Plaintiffs, class members, and their families are without a plain, speedy or adequate remedy at law, thereby rendering injunctive relief appropriate in that (a) damages cannot adequately compensate Plaintiffs and the class for the injuries suffered; (b) damages for the harm inflicted upon Plaintiffs and the class are difficult to ascertain; and (c) if the conduct complained of is not enjoined, a multiplicity of suits will result in that FEMA's unlawful conduct is continuous and ongoing.

**VI.**

**CLAIMS FOR RELIEF**

**COUNT I:**
**DEPRIVATION OF DUE PROCESS**
**U.S. Const. Amend. V**

**(Defendants' Conduct, Including Termination Of The TSA Program, Violates Plaintiffs And Class Members' Substantive And Procedural Due Process Rights.)**

77.     All prior paragraphs are incorporated as if fully set forth herein.

78.     The Fifth Amendment to the United State Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. The Due Process Clause has a substantive component that provides heightened protection against government interference with fundamental rights and liberty interests.  The right to

property, shelter and peaceful possession of one's home are such fundamental rights and liberty interests. Violation of such rights by a government entity gives rise to a private right of action to redress such rights through declaratory, injunctive or other relief.

79.    Plaintiffs Alian Acensio, Aracelis Velez, Denise Nieves, Yaritza de Jesus Lopez, Rosa Rivera, Angel Lauriano Muñoz de Jesus, Bethzaida Crespo Vicente, and Iris Otero, and similarly situated members of the class, have property interests, including a right to retain possession, as tenants in FEMA subsidized hotel/motel units, which have become their homes. Plaintiffs have the right to continuing and orderly housing assistance, and as eligible disaster victims, they may qualify to receive alternative THA. They also have a fundamental right to shelter and peaceful possession of their homes. Defendants' intentional conduct knowingly impinges on these rights.

80.    The Due Process Clause of the Fifth Amendment to the United States Constitution also has a procedural component, prohibiting Defendants from depriving Plaintiffs and similarly situated members of the class of their property interests without adequate and timely notice of the type(s) of THA for which they qualify or may qualify and appropriate procedures for determining their eligibility for and obtaining such assistance prior to FEMA's termination of the TSA Program.

81.    FEMA has failed to provide Plaintiffs and similarly situated members of the class, prior to terminating the TSA Program, with proper notice, information and procedures for determining their eligibility or continuing eligibility for THA, including the programs mentioned above, so that continuing assistance is assured.

82.    FEMA's failure to provide Plaintiffs and similarly situated members of the class, prior to terminating the TSA Program, with proper information and procedures regarding

eligibility for alternative and continuing THA prevents or frustrates Plaintiffs and similarly situated members of their class in obtaining alternative THA, resulting in homelessness and inadequate housing.

83.     This amounts to a deprivation of a property interest without notice and due process.

84.     As a result, Defendants have violated the rights of Plaintiffs Alian Acensio, Aracelis Velez, Denise Nieves, Yaritza de Jesus Lopez, Rosa Rivera, Angel Lauriano Muñoz de Jesus, Bethzaida Crespo Vicente, and Iris Otero, and similarly situated members of the class, under Due Process of law as guaranteed by the Fifth Amendment to the United States Constitution.

85.     Plaintiffs are entitled to a judicial declaration that (a) Plaintiffs have a right to stay in possession of their current shelter; and (b) Defendants' termination of the TSA Program as described above violates Plaintiffs' and class members' constitutional rights.  Plaintiffs are further entitled to injunctive relief restraining and/or enjoining Defendants from terminating TSA without the process prayed for below.

**COUNT II:**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 706(2)(B)**

**(Defendants' Conduct Should Be Declared Unlawful And/Or Set Aside Because It Is Contrary to Constitutional Right, Power, Privilege, Or Immunity.)**

86.     All prior paragraphs are incorporated as if fully set forth herein.

87.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B). In addition, this Court has authority under 28 U.S.C. § 1331

and its traditional powers of equity to declare invalid and enjoin agency action that violates the Constitution.

88.     Where a Complaint contends that agency action offends the Constitution, and for that reason should be enjoined, the Court does not afford deference to the agency, but instead reviews the constitutional issues independently.

89.     As detailed above, Defendants' conduct violates Plaintiffs' substantive and procedural due process rights, including, without limitation, by depriving Plaintiffs of their fundamental right to shelter and peaceful possession of their homes; and doing so without constitutional safeguards, including, without limitation, proper notice and an opportunity to be heard.

90.     Plaintiffs are entitled to a declaratory judgment that Defendants' termination of the TSA Program as described above is unlawful and should be set aside.

## COUNT III:
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
## 5 U.S.C. § 706(2)(A)

**(Defendants' Conduct Should Be Declared Unlawful And/Or Set Aside Because It Is Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law.)**

91.     All prior paragraphs are incorporated as if fully set forth herein.

92.     The APA requires courts to "hold unlawful and set aside" agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not the product of reasoned decision making. This means, among other things, that an agency must provide an adequate evidentiary basis for its action and consider all important aspects of the problem before it.

93.     Defendants' decision to terminate the TSA Program on June 30, 2018, long before Puerto Rico has recovered from Hurricane Maria, and before TSA evacuees are able to apply for and secure THA, or alternative housing, is being made without any plan to assist TSA evacuees in securing housing.  This decision is without reason and is arbitrary and capricious.

94.     Defendants' decision to terminate the TSA on June 30, 2018, violates the APA's prohibition against "arbitrary and capricious" agency action.  FEMA's stated purpose for terminating this support for the class members is that the agency does not think DHAP is needed. This is contrary to the stark facts and the reality faced by the Puerto Rican victims of Hurricane Maria currently relying on FEMA assistance to survive and avoid homelessness.   The stated purpose of terminating the program is not borne out by the facts, and is pretext for other unstated and ulterior purposes.

95.     FEMA has given inadequate consideration, if any, to the viability of possible alternatives for TSA evacuees, including Direct Rental Assistance, upon termination of their short-term housing benefits.

96.     Plaintiffs and class members have suffered a legal wrong.  Defendants' violation has caused and will continue to cause ongoing, irreparable harm to Plaintiffs and class members who have been adversely affected and aggrieved by FEMA's arbitrary and capricious conduct.

97.     An actual controversy exists between Plaintiffs and Defendants regarding whether Defendants' termination of the TSA Program violates Section 706(2)(A) of the APA.

98.     Plaintiffs are entitled to a judicial declaration that Defendants' termination of the TSA Program as described above is unlawful and should be set aside.

**COUNT IV:**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**5 U.S.C. § 706(1)**

**(Defendants Should Be Compelled To Provide The Relief They Have Unlawfully Withheld Or Unreasonably Delayed.)**

99.   All prior paragraphs are incorporated as if fully set forth herein.

100.   The APA requires courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(2)(A).  As detailed above, Defendants have arbitrarily and capriciously decided to terminate benefits to TSA evacuees without any plan in place to transition them into longer-term housing.

101.   Defendants' refusal to activate DHAP or other relief (as they are obligated to do) before terminating benefits under the Transitional Shelter Assistance Program constitutes an unlawful withholding and/or an unreasonable delay of agency action—particularly in light of FEMA's concurrent decision to evict Plaintiffs and class members from their homes on June 30, 2018.

102.   FEMA has elected to evict Plaintiffs, class members, and their families from their temporary homes, while simultaneously withholding benefits that FEMA has historically provided in similar situations, including after Hurricanes Katrina and Rita, to ensure that the termination of TSA does not result in homelessness or worse.

103.   Plaintiffs are entitled to a permanent injunction restraining and/or enjoining Defendants from terminating TSA until Plaintiffs and class members have received sufficient THA to transition to longer-term housing; or Defendants implement an adequate replacement solution.  Plaintiffs are further entitled to a permanent injunction compelling Defendants to accept and process all applications for THA from TSA evacuees for a reasonable period of time, and to notify applicants and class members concerning all forms of THA available to them and the criteria and conditions applicable to such assistance.

**COUNT V:**
**DECLARATORY JUDGMENT**
**28 U.S.C. § 2201**

104.    All prior paragraphs are incorporated as if fully set forth herein.

105.    The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

106.    Plaintiffs are entitled to a declaration of their rights.  Plaintiffs have a property interest in their current temporary shelter and are entitled to additional housing assistance under the Stafford Act.

107.    Plaintiffs are further entitled to a declaration that (a) Defendants' termination of the TSA Program as described above constitutes agency action that is unlawful and should be set aside under the Administrative Procedure Act; and that violates Plaintiffs and Class Members' constitutional rights; and (b) Defendants have unlawfully withheld and unreasonably delayed activation of any assistance or program to replace TSA.

**VII.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Class Members respectfully request that this this Court:

A.    Issue a declaratory judgment that (1) Plaintiffs have a right to retain possession of their current shelter and are entitled to additional assistance under the Stafford Act; (2) Defendants' termination of the Transitional Shelter Assistance Program as described above (a) constitutes agency action that is unlawful and should be set aside under the Administrative Procedure Act; and (b) violates Plaintiffs and Class Members' constitutional rights; and (3) Defendants have unlawfully

withheld and unreasonably delayed activation of any Temporary Housing Assistance or program to replace the Transitional Shelter Assistance Program;

B.    Issue a preliminary injunction restraining and/or enjoining Defendants from terminating the Transitional Shelter Assistance Program pending the outcome of this litigation;

C.    Issue a permanent injunction restraining and/or enjoining Defendants from terminating the Transitional Shelter Assistance Program until either (1) Plaintiffs and Class Members have received sufficient Temporary Housing Assistance to transition to longer-term housing; or (2) Defendants implement a long-term replacement solution such as DHAP or other program that ensures continuing assistance to beneficiaries;

D.    Issue a permanent injunction requiring Defendants to: (1) continue to accept and process all applications for THA from TSA evacuees by telephone and online for a reasonable period of time following issuance of injunctive relief to enable appropriate application by the class of people unlawfully excluded or discouraged from applying for THA; and (2) notify applicants and class members concerning all forms of temporary assistance available to them and the criteria and conditions applicable to such assistance; and

E.    Award such further relief as the Court deems appropriate.

Dated: Worcester, Massachusetts.

June 30, 2018

Respectfully submitted,

By:/s/: Hector E. Pineiro _____
    Hector E. Pineiro#555315
    Robert A. Scott # 648740
    **HECTOR E. PINEIRO LAW OFFICES,**
    **P.C.**
    807 Main Street
    Worcester, MA 01610
    (508) 770-0600

    **MANATT, PHELPS & PHILLIPS, LLP**
    Craig J. de Recat* (CA Bar No. 105567)
    Justin Jones Rodriguez* (CA Bar No.
    279080)
    Eve L. Torres* (CA Bar No. 303651)
    11355 West Olympic Boulevard
    Los Angeles, California 90064
    (310) 312-4000

    Brett Natarelli* (IL Bar No. 6297280)
    20 N. Clark Street
    Suite 3300
    Chicago, IL 60602
    (312) 626-1813

    **LatinoJustice PRLDEF**
    Jose Perez* (NY Bar No. 2026649)
    Deputy General Counsel
    Natasha Bannan* (NY Bar No. 5021167)
    Associate Counsel
    99 Hudson Street
    14th Floor
    New York, New York 10013
    (212) 219-3360

    Kira Romero-Craft* (FL Bar No. 49927)
    Managing Attorney, Southeast Office
    523 West Colonial Drive
    Orlando, Florida 32804
    (321) 418-6354

    *Pro Hac Vice application forthcoming

*Attorneys for Plaintiffs*
ALIAN ACENSIO, ARACELIS VELEZ
CRUZ, DENISE NIEVES, YARITZA DE
JESUS LOPEZ, ROSA RIVERA, ANGEL
LAURIANO MUÑOZ DE JESUS,
BETHZAIDA CRESPO VICENTE, and
IRIS OTERO on behalf of themselves and
all similarly situated individuals