## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ELIZABETH DELGADO SANTOS,
RAFAEL OCASIO BARRETO,
BETHZAIDA CRESPO VICENTE, and IRIS
OTERO, on behalf of themselves and all
similarly situated individuals

        Plaintiffs,

        -against-

FEDERAL EMERGENCY
MANAGEMENT AGENCY, WILLIAM
BROCK LONG, THOMAS VAN ESSEN,
and ALEJANDRO DE LA CAMPA,

        Defendants.

CIVIL ACTION NO. 4:18-cv-40111-TSH

**(Leave To File Granted July 18, 2018)**

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR EMERGENCY
MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY
INJUNCTION AND DECLARATORY RELIEF**

## I.    INTRODUCTION

FEMA devotes the lion's share of its Opposition to the untenable position that it is not

required to assist Hurricane Maria survivors at all, but has nevertheless provided a great deal of

assistance in Puerto Rico to help rebuild the island after the devastation caused by the Hurricane

less than ten months ago. FEMA's descriptions of its obligations and efforts miss the mark both

factually and legally. Plaintiffs do not presently challenge FEMA's overall disaster relief

program in Puerto Rico. Nor do they argue that all of FEMA's functions are non-discretionary.

This case is about nearly 2,000 Hurricane Maria survivors who are already receiving

Transitional Sheltering Assistance ("TSA") in the continental United States and will be evicted

1

without any alternate housing arrangements in place without this Court's intervention. Defendants do not contend that Plaintiffs' homes have been repaired or that they have any viable housing alternative when evicted on July 23, 2018. Based on statute *and* practice, FEMA is required to continue the TSA program for Plaintiffs. But even if that were not the case, promising evacuees a transition into other housing assistance, after being evacuated to the continental United States, removed discretion from the equation. Having recognized the need and extended relief to these evacuees, FEMA cannot simply evict TSA evacuees already under their care without transitioning them into other Temporary Housing Assistance ("THA") or, at minimum, providing them with a fair eligibility determination.

Defendants point out that such THA is less expensive than TSA. If that is true, FEMA has no legitimate reason to further delay transitioning Plaintiffs and the putative class into THA. Plaintiffs do not dispute that THA is likely far less costly than paying for thousands of hotel stays for evacuees for a short-term period or that those disaster survivors could be placed in longer-term housing for a fraction of the cost. Accordingly, Defendants should be required to continue the TSA program until that process is complete. Plaintiffs do not seek an indefinite stay in hotel and motel rooms. They seek basic transitional assistance in order to recover from the devastation caused by Hurricane Maria. Such assistance is non-discretionary and FEMA's refusal to provide it violates the Constitution and mandatory provisions in the Stafford Act and the Administrative Procedures Act ("APA"). The Motion should be granted.

## II.   THE STATUTORY SCHEME CREATES A REASONABLE EXPECTATION OF CONTINUED ASSISTANCE.

The express intent of Congress in enacting the Stafford Act is to provide an "*orderly and continuing* means of assistance by the Federal Government . . . to alleviate the suffering and damage which result" from major disasters like Hurricane Maria. 42 U.S.C. § 5121(b) (emphasis

added). To this end, Section 403 of the Stafford Act, entitled *Essential Assistance*, gives FEMA the power and obligation to perform "work or services essential to saving lives and protecting and preserving property or public health and safety, including . . . emergency shelter . . ." and to "provide assistance essential to meeting immediate threats to life and property resulting from a major disaster" by donating resources to State and local governments "for use or distribution by such governments *in accordance with the purposes of this Act*." 42 U.S.C. §§ 5170b(a)(3)(B), 5170b(a)(1) (emphasis added). One type of "Essential Assistance" under Section 403 is Transitional Sheltering Assistance ("TSA") for hurricane survivors who cannot return to their homes after congregate shelters have closed. Here, TSA remains essential.

Section 403 and its implementing regulations do *not* include guidance for determining when TSA is no longer essential, nor a requirement that a State or local government request an extension of TSA in order for it to continue. *See* 42 U.S.C. § 5170b; 44 C.F.R. § 206.202. In practice, TSA continues until TSA evacuees are able to return to their homes or "<u>until other intermediate housing solutions can be implemented</u>." Dkt. 32-1 (Turi Declaration), Ex. 4, 1 (October 30, 2017, FEMA memorandum activating TSA) (emphasis added). Plaintiffs do not seek TSA indefinitely. They seek TSA "until other intermediate [or longer term] housing solutions can be implemented," just as FEMA promised and the law commands.

These other intermediate solutions, known as Temporary Housing Assistance or THA are enumerated in Section 408 of the Stafford Act, under which disaster survivors are eligible for "financial or other assistance" to meet their housing needs if they have been "displaced from their pre-disaster primary residences," or their pre-disaster primary residences "are rendered uninhabitable as a result of damage caused by a major disaster." 42 U.S.C. § 5174(b)(1).[1] Here,

---

[1] Specific forms of THA are enumerated in the First Amended Complaint and the parties' other papers. *See, e.g.*, Dkt. 28 ¶¶ 38-41. THA includes (1) money for renting alternate housing ("Direct Rental Assistance"), (2) rent-free

3

Plaintiffs seek TSA only until they are placed in another THA program or have a fair eligibility determination. FEMA has defended its decision to discontinue TSA by describing it as "a bridge to intermediate and longer-term housing." Dkt. 28 (First Amended Complaint) ¶ 64.[2] Defendants have also represented that "FEMA collaborates directly with HUD to find housing solutions for disaster survivors and is providing a variety of housing programs to adequately meet the unique needs of survivors . . ." *Id.* ¶ 80.[3] Yet FEMA has failed to offer Plaintiffs any bridge or other housing solution, only eviction. As detailed further below, FEMA's practices place substantive limits on FEMA discretion, giving rise to a constitutionally cognizable property interest. Plaintiffs thus seek an injunction continuing TSA, not indefinitely, but only until these other "housing solutions" promised by FEMA are actually in place.

## III.   DEFENDANTS MISCHARACTERIZE THE GOVERNOR'S ROLE.

Defendants incorrectly assert that FEMA is powerless to continue TSA without a formal request from Puerto Rico's Governor. This assertion fails for three reasons.

First, there is simply no statutory or regulatory authority to support FEMA's claim that it can continue TSA only after a formal Governor request. Defendants cite 44 C.F.R. Section 206.225, however, this regulation does *not* require a State or local official to submit a request for extension of Section 403 Essential Assistance. It relates to "Emergency Work," and does not reference Section 403, "Essential Assistance," or TSA. This regulation merely allows FEMA to require certification "that a threat exists, including identification and evaluation of the threat and recommendations of the emergency work necessary to cope with the threat" when determining whether emergency work is required. *See id.* § 206.225(a)(1). This regulation does not set forth

---

occupancy in federally provided temporary housing, (3) money for repair of owner-occupied housing, and (4) money for replacement of owner-occupied housing, follows TSA. *See*, 42 U.S.C. § 5174(c); 44 C.F.R. § 206.117(b).
[2] quoting FEMA News Release Number DR-4339-PR NR 038.
[3] quoting FEMA Media Library (May 3, 2018), available at https://www.fema.gov/media-library/assets/images/163928)

any procedure for extending "emergency work." It is undisputed that the initial certification

occurred here. Section 206.225 is thus not a bar to continued TSA.

Defendants also point to FEMA's Public Assistance Program and Policy Guide (PAPPG)

and the Individuals and Households Program Unified Guidance (IHPUG) issued by the Acting

Assistant Administrator of FEMA. *See* PAPPG at vii-viii; IHPUG at 1. These are internal agency

guidelines, not binding statutory limits. Specifically, FEMA cites page 67 of the PAPPG for the

proposition that a Governor request is a prerequisite to continued assistance. Dkt. 32 at 19. But

page 67 does not even include the word "Governor." In any event, the PAPPG *invites* policy

recommendations, and states that FEMA will conduct a comprehensive review of the guide no

less than every three years. PAPPG at viii. Seeking a Governor's formal request *may* be FEMA

practice, but it is not, as Defendants contend, a statutory mandate.

Second, FEMA engineered the circumstances in Puerto Rico to prevent a request from

the Governor. When FEMA granted the "final" extension of TSA on May 3, 2018, which the

Governor requested "due to a large number of damaged homes across the island and a lack of

available utilities in many areas," FEMA unilaterally announced that "*no further extensions will

be granted*." Dkt. 32-1, Ex. 9. FEMA closed the door on any requests for extensions, which

would be dead on arrival, despite a large number of damaged homes across the island and

Plaintiffs' lack of alternative housing. Governor Rosselló's May 3, 2018, Press Release, does

nothing more than acknowledge FEMA's announcement of "the last extension." Dkt. 32-1, Ex.

10. It does not, as Defendants incorrectly suggest, prove that the Governor initially refused to

apply for an extension before FEMA's May 3 announcement, or that the Governor believed TSA

was no longer necessary. The issue of whether Governor Rosselló requested a further extension

of TSA, before or after FEMA announced that there would be no further extension, is disputed

by representatives of the Governor's Office.[4] Even if Governor Rosselló were statutorily

required to request an extension for FEMA to have authority to extend TSA (which he is not),

the parties should be permitted to present evidence and testimony to resolve the factual dispute.

*See Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 740-41 (5th Cir. 2008) (requiring

further fact finding on FEMA's policies and practices before deciding due process issue).

      <u>Third</u>, this is not a case about hurricane evacuees staying in hotels adjacent other viable

housing options in the continental United States; or about a Governor requesting an extension of

aid within their state or territory. This case is about TSA evacuees living hundreds or thousands

of miles away from their destroyed former residences without any other viable housing option.

Plaintiffs face geographic, linguistic, economic and other barriers that are unparalleled and

unaccounted for by FEMA. On these unprecedented and undisputed facts, FEMA's internal

working guidelines fail, and their rigid application would leave hundreds of hurricane

survivors—who continue to live in extremely precarious conditions and with numerous

economic, medical and social challenges—homeless.

## IV.   <u>SOVEREIGN IMMUNITY DOES NOT SHIELD DEFENDANTS FROM THEIR UNLAWFUL ACTS.</u>

      Defendants attempt to hide behind sovereign immunity even though they concede that it

does not apply to most of Plaintiffs' claims, and no case has held that FEMA is immune on facts

analogous to this case.

      <u>First</u>, as Defendants concede, FEMA is not shielded by sovereign immunity from

Plaintiffs' constitutional claims, Counts I (due process) and VI (equal protection). Count II

(which seeks to set aside unconstitutional acts under the APA) and Count V (which seeks

---

[4] Justin Carissimo, *Judge Orders Housing Extension for Hurricane Evacuees as Puerto Rico, FEMA Ignite Spat*; CBSNews.com (Jul. 5, 2018 7:49 PM EDT), https://www.cbsnews.com/news/hurricane-maria-evacuees-judge-gives-housing-extension-today-amid-fema-puerto-rico-spat-2018-07-03; *see also*, https://mobile.twitter.com/DavidBegnaud/status/1014240687355760640?p=v.

declaratory relief on, *inter alia*, Plaintiffs' constitutional rights) are also not implicated by sovereign immunity. The heart of Plaintiffs' case is constitutional in nature and not subject to sovereign immunity as a matter of law.

Second, Defendants concede that "[u]nder some circumstances [which are present here], the Administrative Procedure Act is a valid and applicable waiver" to the sovereign immunity defense. Dkt. 32 at 11. Indeed, Section 702 of the APA confers authority on this Court to review agency actions in lawsuits such as this, seeking declaratory or injunctive relief on behalf of persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The mandate for judicial review under Section 702 is clear:

> An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority **shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party**.

5 U.S.C. § 702 (emphasis added). The sovereign immunity defense fails for this reason alone.

In *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997 (9th Cir. 1998)—a case relied on by Defendants—the Ninth Circuit *reversed* a district court's order granting a motion to dismiss on the basis of sovereign immunity citing to, *inter alia*, Section 702. *Id.* at 1002; *see also Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007) (Section 702 "waiver is for all equitable actions for specific relief against a Federal agency or officer acting in an official capacity." (internal citations omitted)). FEMA is not shielded by sovereign immunity from Plaintiffs' APA claims (Counts II through V) because each seeks only declaratory relief.

Third, the gravamen of Defendants' sovereign immunity defenses is that TSA is discretionary under *United States v. Gaubert*, 499 U. S. 315 (1991). But here, there is no "element of judgment," much less one that sovereign immunity "was designed to shield."

Plaintiffs' Count VII, which arises from the *mandate* under the Stafford Act that "relief and assistance activities *shall* be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, disability, English proficiency, or economic status," is plainly non-discretionary. 28 U.S.C. § 5151(a) (emphasis added). Defendants are not immune from liability for any actions that violate the non-discrimination mandate. *See McWaters v. FEMA*, 436 F. Supp. 2d 802, 816-17 (E.D. La. 2006) (Section 5151(a) removes discretion to decide whom to assist).

Defendants also cite *Ridgely*, for the proposition that disaster relief is discretionary. But *Ridgely* does not discuss sovereign immunity. Indeed, the Court permitted the lawsuit to continue, remanding to the trial court for further evidentiary hearings. 512 F.3d at 740-41. And *Ridgley* explained that FEMA's pattern and practices could place substantive limits on discretion, giving rise to an actionable property interest. *Id.* As detailed further below, FEMA's conduct in this case has so limited its discretion.[5]

Further, the FEMA function that Defendants characterize as discretionary is not the function that Plaintiffs seek to enjoin. This Court does not, as Defendants contend, have to determine whether "FEMA's decision to implement the TSA program is indeed discretionary." Dkt. 32 at 12. Plaintiffs <u>do not</u> challenge FEMA's decision to implement TSA; nor do Plaintiffs challenge FEMA's determination as to any person's eligibility for TSA. Plaintiffs challenge Defendants' unlawful, inequitable and discriminatory administration of TSA without due process, including termination of this "Essential Assistance," before the homes of evacuees are

---

[5] *Ridgley* is also inapposite because it (like almost every other case Defendants cite) involved the denial of applications in the first instance. The *Ridgley* Plaintiffs all applied for and were determined ineligible for, further Section 408 rental assistance. In stark contrast, Plaintiffs here have not all had the opportunity to apply for Section 408 assistance and receive a final determination thereof from Defendants. If Defendants terminate TSA on July 23, 2018, Plaintiffs will not be deprived of monetary assistance, but will lose the roofs over their heads. In any event, the Court of Appeals in *Ridgley* did not decide whether sovereign immunity barred.

again habitable in Puerto Rico, or alternatively, before evacuees have been provided with the

opportunity to apply for and receive a determination from FEMA for housing assistance under

Section 408 of the Stafford Act.

    For this reason, the Court of Appeals decisions upon which Defendants rely are

inapposite. None of the plaintiffs in these cases challenge the government's application,

operation or discontinuance of Section 403 Essential Assistance. Instead, these cases are all

challenges to *initial* eligibility determinations, mostly in other contexts.[6]

    For instance, in *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556

F.3d 307 (5th Cir. 2009), a municipality challenged FEMA's decision to not approve funding for

sediment dredging, based on FEMA's initial eligibility determination that marsh grass removal is

considered ineligible. *See* 556 F.3d at 312.[7] FEMA has already determined that Plaintiffs here

were entitled to TSA, which they are currently receiving. Sovereign immunity does not apply to

these facts because the discontinuance of TSA is not discretionary and gives rise to constitutional

violations. *See, e.g.*, *McWaters*, 436 F. Supp. at 814 ("authority to review FEMA's actions

clearly exists as to any actions that are mandated by statute, and more importantly, any actions

---

[6] The district court cases cited by Defendants are also inapposite and largely relate to initial eligibility determinations by the government. *See, e.g.*, *Konashenko v. FEMA*, No. 12-cv-3034, 2014 WL 1761346 (E.D.N.Y. Apr. 29, 2014) (challenging denial of claim for FEMA funds to remediate damage to property); *Orleans Parish Comm. Dist. v. FEMA*, No. 11-cv-209, 2011 WL 4829887 (E.D. La. Oct. 12, 2011) (APA challenge to FEMA's denial of reimbursement request by municipality); *Maleche v. Solis*, 692 F. Supp. 2d 679 (S.D. Tex. 2010) (challenging disaster-related unemployment benefits eligibility determination); *City of Laguna Niguel v. FEMA*, No. 09-cv-0198, 2009 WL 3122490 (C.D. Cal. Sept. 28, 2009) (APA challenge to eligibility determination for program to stabilize hillside after landslide); *Lawson v. FEMA*, No. 03-cv-0881, 2003 WL 2006600 (S.D.N.Y. April 30, 2003) (challenging denial of claim for unemployment assistance), *aff'd*, 104 F. App'x. 216 (2d Cir. 2004); *City of San Bruno v. FEMA*, 181 F. Supp. 2d 1010 (N.D. Cal. 2001) (challenging FEMA's determination that city was ineligible for requested relief); *California-Nevada Methodist Homes, Inc. v. FEMA*, 152 F. Supp. 2d 1202 (N.D. Cal. 2001) (challenging denial of requested disaster-relief funds); *Lockett v. FEMA*, 836 F. Supp. 847 (S.D. Fla. 1993) (challenging denial of applications for temporary housing and subsequent eligibility determinations); *State of Kan. ex rel. Hayden v. United States*, 748 F. Supp. 797 (D. Kan. 1990) (APA challenge to president's denial of request to declare a "major disaster"); *Dubow v. FEMA*, No. 2:16-cv-3717, 2018 WL 472816 (E.D.N.Y. Jan. 18, 2018) (APA challenge to decision to permit alternate use of FEMA funds).

[7] *See also Rosas v. Brock*, 826 F.2d 1004 (11th Cir. 1987) (brought on behalf of an individual who applied for and was denied disaster unemployment benefits because not an eligible "unemployed worker"); *Ornellas v. United States*, 2 Cl. Ct. 378 (1983) (challenging government's determination of ineligibility for emergency feed program).

that may rise to the level of a constitutional violation by the agency").

Instead of these challenges to *initial* agency determinations of eligibility cited by Defendants, the instant case is more analogous to *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), in which the Supreme Court held that the Coast Guard, having undertaken to provide lighthouse service, had a duty to use due care, and if the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States was liable under the Tort Claims Act. Justice Frankfurter explained:

> The Coast Guard need not undertake the lighthouse service. ***But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care*** to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Indian Towing Co.*, 350 U.S. at 69.

Once the government undertakes to supply a service—here the provision of Section 403 Essential Assistance—then it must be held responsible for its wrongful acts in supplying or discontinuing the service. In other words, the discretionary exception only reaches the decision *as to whether to supply the service or not*. But once the decision has been made to supply the service, sovereign immunity evaporates as to Defendants' wrongful conduct.

Here, FEMA endeavored to provide Essential Assistance to Hurricane Maria evacuees in transitional shelters throughout the continental United States. Before the evacuees have had the opportunity to secure alternative housing and receive determinations on applications for Section 408 assistance, FEMA plans to terminate TSA only nine months[8] after Hurricane Maria hit the ground in Puerto Rico. In contrast, FEMA extended temporary housing assistance for up to 26

---

[8] FEMA has extended TSA beyond nine months, but only upon order by this Court.

months for Hurricane Katrina evacuees.[9] FEMA has assumed the role of the proverbial

lighthouse for Hurricane Maria/TSA evacuees, and it is turning off the light before Plaintiffs

have found their way to a safe harbor—home either in the Continental U.S. or in Puerto Rico.

Under *Indian Towing*, that decision is actionable.

Finally, one cannot help but note the glaringly incongruent positions advanced by

Defendants in support of their claim of sovereign immunity. On the one hand, Defendants seek

to shield themselves from liability by stating that their actions represent "discretionary function

or duty." On the other hand, Defendants attempt to justify their conduct by stating that FEMA

actually had *no discretion* or authority to continue TSA because an extension—*after* FEMA

announced it would not renew TSA—has not been requested by the Governor or Puerto Rico. In

fact—and as detailed below in Section V.A.1—there are substantive limits on Defendants'

discretion that negate sovereign immunity and give rise to a protected property interest.

## V.      THE COURT SHOULD GRANT PRELIMINARY INJUNCTIVE RELIEF.

The parties agree on the well-established factors for preliminary relief: (1) a reasonable

likelihood of success on the merits; (2) irreparable harm in the absence of injunctive relief; (3)

the balance of equities tips in favor of injunctive relief; and (4) an injunction is in the public

interest. *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014). Defendants, however, hinge their

Opposition on only the first factor (the likelihood of success on the merits) as it pertains to only

one of Plaintiffs' seven claims (due process). Defendants ignore almost all of Plaintiffs' case and

rehash the same discretion argument outlined in their sovereign immunity defense.

Plaintiffs state seven causes of action, alleging that FEMA's discontinuance of TSA in

this instance (1) violates procedural and substantive due process; (2) is unconstitutional and thus

---

[9] https://www.fema.gov/news-release/2009/04/07/fema-temporary-housing-program-ending-families-hurricanes-katrina-and-rita.

unlawful under Section 706(2)(B) of the APA; (3) is an arbitrary and capricious abuse of

discretion and thus unlawful under Section 706(2)(A) of the APA; (4) constitutes unlawful

withholding or unreasonable delay of agency action that must be compelled under Section 706(1)

of the APA; (5) is unlawful and unconstitutional, entitling Plaintiffs to relief under the

Declaratory Judgment Act; (6) is unequal and discriminatory in violation of the equal protection

component of the Due Process Clause; and (7) violates the Stafford Act's prohibition against

discrimination in disaster assistance. A likelihood of success on any one of these counts warrants

preliminary injunctive relief.

The crux of Defendants' argument is that TSA is entirely discretionary. Even if that were

true—and it is not—discretion would militate against only Plaintiffs' first cause of action and the

existence of a constitutionally cognizable property interest in continued TSA. Plaintiffs also

argue that, to the extent FEMA has discretion, the agency unlawfully abused it. For instance,

Plaintiffs' third cause of action challenges the premature discontinuance of TSA as an arbitrary

and capricious "*abuse of discretion*." Dkt. 28 ¶¶ 116-23. Plaintiffs' sixth cause of action alleges

an unequal *exercise of discretion* on account of race, national origin and kind of American

citizenship, all suspect classifications. *Id.* ¶¶ 133-39. And Plaintiffs' seventh cause of action

alleges unlawful discrimination in disaster assistance on account of race, color, nationality,

English proficiency and economic status—*i.e.*, a *discriminatory abuse of discretion*. *Id.* ¶¶ 140-

46. Defendants argue that TSA is discretionary, but they fail to defend the manner in which they

exercised their purported discretion. Discretion is not intended to be entirely subjective and void

of scrutiny, which is precisely why constitutional and statutory limits have been placed on it.

Independent of the due process and property right issues, the Motion should be granted

because, *at minimum*, Plaintiffs are likely to succeed on their claims that Defendants abused their

discretion in a manner (whether arbitrary, capricious, discriminatory or otherwise unlawful) that will cause irreparable injury to Plaintiffs without the requested injunction. As detailed further below, Plaintiffs are also likely to succeed on their due process claim and the other counts.

### A.      Plaintiffs Are Likely To Succeed On The Merits.

Plaintiffs do _not_ need to prove their claims at this stage; the Court need only find that there is a likelihood of success on the merits of _one_ of Plaintiffs' counts. _See Westenfelder v. Ferguson_, 998 F. Supp. 146, 150 (D.R.I. 1998).

### 1.      Plaintiffs Are Likely To Succeed On Their First Cause Of Action Because FEMA's Discontinuance of TSA Violates Substantive and Procedural Due Process.

To establish that FEMA's conduct violates due process, the Court must (1) examine whether Plaintiffs were deprived of a constitutionally protected property interest; then (2) determine what process was due _prior to_ any government deprivation of that interest. _Goss v. López_, 419 U.S. 565, 577 (1975). Plaintiffs are likely to prevail on both prongs.

### a.      Plaintiffs Have A Constitutionally Cognizable Property Interest In Continued Transitional Sheltering Assistance.

### (1)      Continued TSA Is Not Discretionary In This Instance.

Defendants erroneously assert that Plaintiffs have failed to identify a property interest protected by the Due Process Clause because "where benefits are discretionary in nature, plaintiffs have no property interest." None of the cases Defendants cite stand for this oversimplified rule.[10] Instead, they provide (1) that property interests can be rooted in statute _or_ in other sources such as an agency's practices; and (2) even if statutory benefits are

---

[10] The other two cases Defendants cite for the rule that _any_ discretion negates the existence of a property interest involved situations of near absolute discretion in a completely unrelated context, law enforcement. In _Blackburn v. City of Marshall_, 42 F. 3d 925, 941 (1996), plaintiff had only a unilateral expectation to use of local police radio frequency because _no statute whatsoever_ governed the "benefit" at issue, _Town of Castle Rock Colo. v. Gonzales_, 545 U.S. 748, 760-61 (2005), affirmed dismissal of a suit against police officers for failing to enforce a TRO because there is a "_well established tradition of police discretion_" that is necessary on the ground when police officers need to make quick decisions about whether to make an arrest. These facts are plainly inapposite.

discretionary, they give rise to a property interest where there are substantive limitations on such

discretion. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("Property

interests, of course, are not created by the Constitution. Rather they are created and their

dimensions are defined by existing *rules or understandings* that stem from an independent

source such as state law—*rules or understandings* that secure certain benefits and that support

claims of entitlement to those benefits." (emphasis added)); *Ridgely*, 512 F.3d at 735 ("To

determine whether statutes or regulations create a protected property interest, we must ask

whether they place 'substantive limitations on official discretion.'").

Defendants oversimplify the Court's Due Process jurisprudence and limit their analysis to

the language of the Stafford Act and its implementing regulations. But under *Roth* and its

progeny, other "rules or understandings" also give rise to constitutionally cognizable property

rights. *Ridgely*, the primary authority on which Defendants rely, agrees with *Roth*. *Ridgely* did

not hold, as Defendants incorrectly suggest, that evacuees have no property right in continued

housing assistance. Instead, the court stated:

> *[A]t this time* plaintiffs have not made the required showing.
> *Standing alone*, the statute and regulations governing the rental
> assistance program are not sufficient to create a property interest.
> The possibility remains that plaintiffs can establish a property
> interest based on FEMA's policies and practices in implementing
> the statute and regulations to provide rental assistance.

*Id.* at 735.[11] *Ridgely* then remanded for additional fact finding on FEMA's policies and practices,

but the case settled before any court could make a final determination on either the existence or

scope of the property right at issue. In contrast, *McWaters v. FEMA*, 436 F. Supp. 2d 802 (E.D.

La. 2006), conducted the requisite fact finding and held that persons who qualify as eligible have

---

[11] *Ridgely* analyzed Section 408 of the Stafford Act, which is not at issue in this case. As explained above, Section 408 governs Temporary Housing Assistance—a form of assistance that comes *after* TSA. In this case, FEMA has not yet transitioned Plaintiffs from TSA to THA. Instead, they seek to evict Plaintiffs without an adequate transition plan in place. At bottom, the facts of *Ridgely* do not yet exist in this case.

a property interest in housing assistance "by virtue of the automatic, non-discretionary nature of FEMA's provision of [such] assistance as found in both *practice* and the Stafford Act and its implementing regulations." *Id.* at 818 (emphasis added).[12] Under *Roth*, *Ridgely* *and* *McWaters*, both statute and agency practice can give rise to a constitutionally protected property interest.[13]

Applying the foregoing principles, the Court has robust authority to find that Plaintiffs are likely to identify a property interest protected by the Due Process Clause through *either* the Stafford Act *or* another independent source such as FEMA's conduct.

The Stafford Act itself gives Plaintiffs a legitimate claim of entitlement to continued TSA for at least three reasons. First, Congress intended the Stafford Act to provide an "orderly and *continuing* means of assistance by the Federal Government . . . to alleviate the suffering and damage which result" from major disasters like Hurricane Maria. 42 U.S.C. § 5121(b) (emphasis added). This includes TSA for evacuees who meet certain eligibility criteria, including displacement from their pre-disaster primary residences. These eligibility criteria give rise to an entitlement because they substantively limit FEMA's discretion. *See Goldsmith v. U.S. Bd. of Tax Appeals*, 270 U.S. 117, 123 (1926) (broad discretion to deny admission tempered by due process); *accord Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (finding property interest in "welfare" benefits for "eligible" recipients). Eligibility is not in question here because FEMA has provided TSA to each class member, either based on eligibility or waiver of eligibility criteria.

---

[12] In this case, the parties and the Court have not had the opportunity to conduct the fact finding required under *Ridgely*. The Court should (at minimum) extend the TRO until after initial discovery and a full evidentiary hearing.

[13] Defendants attempt to dismiss *McWaters* as bad law, arguing that *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008) abrogated the case. But *Ridgely* *did not* mention *McWaters* *or* TSA. As detailed above, *Ridgley* did not hold that plaintiffs lacked an actionable property right. The court employed narrow remand language and left the issue for the trial court to decide. The other cases Defendants cite to challenge *McWaters* do not state that *McWaters* is bad law, but instead limit *McWaters* to its own facts—facts that are also present in this case. *See In re Fema Trailer Formaldehyde Prod. Liab. Litig.*, No. MDL 07-1873, 2010 WL 2010487, at *6, n.15 (E.D. La. May 18, 2010), *aff'd sub nom. In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807 (5th Cir. 2013) (explaining *as dicta in a footnote* that certain *McWaters* language "is significantly weakened" by *Ridgley*); *Bishop v. City of Galveston, Tex.*, No. CIV.A. H-11-4152, 2013 WL 960531, at *12 (S.D. Tex. Mar. 12, 2013), *aff'd sub nom. Bishop v. City of Galveston*, 595 F. App'x 372 (5th Cir. 2014) (quoting *In re Fema Trailer*).

Plaintiffs thus have an entitlement to continued TSA.

Second, the Stafford Act's nondiscrimination provision is mandatory: "[R]elief and assistance activities *shall* be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, disability, English proficiency, or economic status." 42 U.S.C. § 5151(a) (emphasis added). This substantive limitation on discretion (not addressed in *Ridgley*) also gives rise to a property interest. *McWaters*, 436 F. Supp. 2d at 816-17.

Third, Defendants conflate the initial disaster declaration and purported discretionary grant of assistance with continuance of TSA. FEMA exercised discretion, if at all, to provide assistance in the first instance and evacuees left Puerto Rico to states participating in the TSA program. Plaintiffs do not challenge either FEMA's initial grant of assistance or its denial of any applications in the first instance. This case is about *discontinuance* of assistance and forcing Plaintiffs out of their current homes without either a pre-eviction proceeding or a viable housing alternative. On these facts, FEMA cannot simply terminate assistance with unfettered discretion.

FEMA's policies and practices in implementing the TSA program have also created a constitutionally cognizable property interest. This is the key distinction between *Ridgley* and *McWaters*. Whereas *Ridgley* remanded to the trial court for further factual development on FEMA's policies and practices (*Ridgely*, 512 F.3d at 735), *McWaters* conducted the required factual inquiry (*see McWaters*, 436 F. Supp. 2d at 817) and found a protected property interest. For instance, Donna Dannels, FEMA's then-Acting Deputy Director of the Recovery Division, testified in *McWaters* that every eligible hurricane survivor, received assistance ("If they are eligible, we will pay"). *Id. McWaters* thus found that, in practice, FEMA assistance is not discretionary. The *McWaters* reasoning applies here because Dannels' admission remains

binding upon FEMA. FEMA purports to give TSA to *all* continuously eligible applicants.

The Court should follow *Ridgely* and extend the TRO pending a full evidentiary hearing on FEMA's policies and practices. *See Ridgely*, 512 F.3d at 740 ("Whether FEMA, by its policies and practices, has created a property interest in continued rent assistance is a fact-intensive question, and, given the limited factual development below, one we cannot answer."). But even on the existing record, FEMA's policies and practices substantively limit discretion and thus there is a likelihood that Plaintiffs will make the required showing. For instance:

- Defendants point to the "interim" TSA policy developed after Rita and Katrina. Dkt. 32-1, Ex. 1. According to that policy, "FEMA *will* authorize and fund the use of hotels" in accordance with their protocol; and "[i]ndividuals and households *will* be classified as an 'Eligible TSA Evacuee' and made eligible for initial Transitional Sheltering" if they meet certain criteria. *Id.*, 1, 3. Based on the interim policy, TSA may not be discretionary.

- Defendants also rely on FEMA's Transitional Sheltering Assistance Playbook/Statement of Policy ("SOP"). Dkt. 32-1, Ex. 2. The SOP bases TSA activation on "data analysis and other assessment information"—not discretion. *Id.*, 2. FEMA has also endeavored to "utilize system processes to limit manual intervention" when evaluating extensions. *Id.*, 42. The entire SOP appears to be a guide to limiting FEMA discretion.

- In this case, FEMA promised more. The October 30, 2017, FEMA memorandum activating TSA, states that TSA "is a short-term sheltering solution *until other intermediate housing solutions can be implemented*." Dkt. 32-1, Ex. 4, 1 (emphasis added). Plaintiffs do not seek TSA indefinitely. They seek TSA "until other intermediate [or longer term] housing solutions can be implemented."

The few policy documents Defendants have submitted in support of their position actually support issuance of an injunction because FEMA's policies and practices have substantively limited discretion, giving rise to a property interest in continued TSA. On this basis, Plaintiffs are likely to establish a property interest and succeed on the merits of their due process claim.

### (1)    The Property Interest At Issue Is Fundamental.

Defendants' discussion of the property interest at stake focuses entirely on whether there is a property interest sufficient to trigger procedural due process rights, ignoring entirely the *substantive* component of Plaintiffs' claim. As Plaintiffs explained in the Motion, "[t]he Due

Process Clause has a substantive component that provides heightened protection against government interference with fundamental rights and liberty interests." Dkt. 3 at 5; Dkt. 28 ¶¶ 12, 102-104 (alleging that Plaintiffs have fundamental rights to property, shelter and peaceful possession of their homes that have been violated by FEMA in a manner that is not narrowly tailored to meet any compelling state interest). Defendants do not address Plaintiffs' claim that the property interest at stake implicates fundamental property and liberty interests that trigger heightened scrutiny.[14]

Defendants mistakenly analyze the interest at stake as a mere "benefit" ignoring altogether that this case is about the home—indeed, the only homes Plaintiffs have until their residences in Puerto Rico are repaired or they are afforded other transitional housing. In this light, the property interest at stake is reinforced by an undeniable liberty interest. "[S]afeguarding of the home does not follow merely from the sanctity of property rights. The home derives its preeminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted constitutional right." *Hodgson v. Minnesota*, 497 U.S. 417, 448 n.33 (1990). Thus, an "overriding respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601 (1980). *See also United States v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1993) ("Good's right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance.").

---

[14] Substantively, the existence of a property interest in continued TSA is consistent with the Supreme Court's decisions in other contexts. *See Goldberg v. Kelly*, 397 U.S. 254 (1970)(welfare recipients have property interest); *Perry v. Sinderman*, 408 U.S. 593 (1977)(college professor who had understanding that he would not be fired, arising from de facto tenure policy, has property interest); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)(government employee who could not be fired except for cause has a protected property interest). These cases all recognize that the property protected by the constitutional right to due process is not limited by traditional notions of real or chattel property.

At bottom, FEMA bears the burden to show not only a compelling government interest, but also that discontinuance of TSA in this instance is narrowly tailored to achieve that interest. FEMA cannot make such a showing.

> **b.   FEMA's Conduct Is Unconstitutional Because It Fails To Adhere To Constitutionally Guaranteed Procedural Safeguards.**

Plaintiffs are also likely to show that FEMA has failed to provide constitutionally adequate due process for two reasons. First, the constitutional baseline for procedural due process—which has not been met here—includes adequate notice *and* an opportunity to be heard "at a meaningful time and in a meaningful manner." *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (citation and internal quotation marks omitted); *see also Jordan Hosp., Inc. v. Shalala*, 276 F.3d 72, 78 (1st Cir. 2002). As Plaintiffs explained in the Motion, the limited notices sent to evacuees failed to provide any information regarding review of eligibility, right to appeal, or opportunity to be heard. Nor did they include information about other housing or transitional assistance. They were functionally little more than an eviction notice to "get out." Defendants appear to concede this point. Each example of notice analyzed in the Opposition amounts to the same thing: participants may have been informed of the program end date. Dkt. 32 at 20-22. Such bare notice does not pass constitutional muster. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (school informed students of suspension, but violated due process by not providing opportunity to be heard appropriate to the nature of the case).

Second, the balance of factors in this case requires greater due process. The level of process due is determined based on a balance of factors, including "the nature of the private and public interests involved; the risk of erroneous deprivation accruing under the procedures used by the state; and the probable benefit of demanding additional procedural safeguards." *Amsden*, 904 F.2d at 753; *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, the nature of the

private interest involved and the magnitude of the risk of deprivation is significant, affecting the very livelihood of TSA evacuees. Significant procedural safeguards are thus warranted.

For instance, in *Goldberg v. Kelly*, the Supreme Court found that a pre-termination hearing was required because "welfare" benefits implicate the recipient's very livelihood. *Goldberg*, *supra*, 397 U.S. at 264 ("Thus the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy."); *see also Saurino v. Weinberger*, 396 F. Supp. 992, 999 (D.R.I. 1975) ("[I]t is not the 'weight' but the 'nature' of the interest at stake that determines whether due process applies."). Like the plaintiffs in *Goldberg*, Plaintiffs' situation will become immediately desperate if TSA is discontinued pending a fair process; the process must occur prior to termination. An adequate process here must be one that continues TSA until each Plaintiff is transitioned into other housing or receives a fair eligibility determination.

Because Defendants have, at most, provided only a bare notice with no other process, Plaintiffs are likely to succeed on their procedural due process claim.

### 2.    Plaintiffs Are Likely To Succeed On Their Second Through Fourth Causes Of Action Under the Administrative Procedures Act.

Plaintiffs are also likely to succeed on the merits of *each* of their claims under the APA. Defendants do not contend otherwise. Instead, they hinge their Opposition on sovereign immunity, which, for the reasons discussed above, does not protect Defendants from liability in this case. Defendants have not responded to the substance of Plaintiffs' APA claims. The Motion should be granted on this basis alone.

First, Section 706(2)(B) of the APA *requires* courts to hold unlawful and set aside any agency action that is contrary to constitutional right, power, privilege or immunity. Plaintiffs are likely to succeed on the second cause of action for violation of Section 706(2)(B) for the same reasons they are likely to succeed on their constitutional claims.

Second, Section 706(2)(A) of the APA *requires* courts to set aside any agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. As Plaintiffs argued in their opening memorandum, agency action is arbitrary and capricious if it is not the product of reasoned decision making; therefore FEMA is required to provide an adequate evidentiary basis for its actions and consider all important aspects of the problem before it. Defendants have not explained their evidentiary basis for discontinuing TSA without a transition plan in place and before Plaintiffs have been able to find any other place to go. In fact, FEMA concedes that transitioning Plaintiffs to THA would be more cost effective. *See* Dkt. 32 at 23; Dkt. 32-1 ¶ 35. FEMA's decision defies reason. Plaintiffs are likely to succeed on their third cause of action as well.

Third, Section 706(1) of the APA *requires* courts to compel agency action where such action has been unlawfully withheld or unreasonably delayed. As detailed above, FEMA is required to provide assistance and its withholding of non-discretionary assistance is unlawful. And although Defendants go to great length to describe the various programs available to Maria survivors, (*see* Dkt. 32-1 ¶¶ 55-78), they fail to show that Section 408 assistance has been extended to Plaintiffs, who will be evicted without another housing options either in Puerto Rico or the continental U.S.. Plaintiffs are also likely to prevail on their fourth cause of action.

### 3. Plaintiffs Are Likely To Succeed On Their Sixth And Seventh Causes Of Action For Discrimination.

Plaintiffs are also likely to succeed on the sixth cause of action for violation of the equal

protection component of the Fifth Amendment's Due Process Clause, which as Defendants concede, is not barred by sovereign immunity. Where, as here, state actors classify Puerto Ricans (as opposed to continental Americans) for disparate treatment, "their actions, where they fail to withstand strict scrutiny, clearly violate the Equal Protection Clause." *Zappa v. Cruz*, 30 F. Supp. 2d 123, 130 (D.P.R. 1998), *aff'd sub nom. DiMarco-Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001); *see also United States v. Vaello-Madero*, ---F. Supp. 3d----, 2018 WL 2208046, at *3 (May 14, 2018) (noting recent development concerning Puerto Rico and Hurricane Maria and the "national and local consensus against such disparate treatment"). In their First Amended Complaint, Plaintiffs set forth stark differences in FEMA's preparation for and response to Hurricane Maria, primarily impacting citizens residing in Puerto Rico, and its preparation for and response to Hurricanes Irma and Harvey, which impacted citizens residing on the continental United States. Dkt. 28 ¶¶ 58-63.[15] Defendants' actions can only survive strict scrutiny if they are narrowly tailored measures that further compelling governmental interests. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Defendants have not proffered[16] (and will not be able to establish) any government interest, let alone a compelling government interest,

---

[15] FEMA extended TSA to Harvey evacuees seven times compared to the three extensions it granted to Maria survivors. Dkt. 28 ¶ 88. And, although FEMA planned to terminate TSA for the survivors of both hurricanes on the same day, June 30, 2018, FEMA initiated TSA to Texans two months before it launched the program for Puerto Rican evacuees. *Id.* Moreover, approximately 7.6 million Texans were impacted by Hurricane Harvey, while approximately 3.8 million Puerto Ricans were impacted by Hurricane Maria. It would not be surprising, then, to see larger raw numbers for Texas relief than Puerto Rico. However, within 9 days of Harvey, FEMA had approved—not about double—but *over twenty-two times* as much financial assistance as it had within 9 days of Maria. *See* 2017 Hurricane Season FEMA After-Action Report (July 12, 2018), 2, *available at* https://www.fema.gov/media-library/assets/documents/167249. These facts are more than sufficient to establish a prima facie case of disparate treatment which "requires only a 'small showing,' one that is 'easily made.'" *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). "By establishing a prima facie case, a plaintiff creates an inference of discrimination." *Id.* Plaintiffs have amply met that standard. Now the government bears the burden to demonstrate—with evidence—a non-discriminatory for the disparate treatment FEMA's own publications admit occurred.
[16] Plaintiffs acknowledge that Defendants did not have an opportunity to respond to this cause of action added in Plaintiffs' FAC, which was filed the day before Defendants' Opposition. Plaintiffs' factual investigation is developing and new details regarding FEMA's failure to properly respond to Hurricane Maria are still surfacing, as further evidenced by FEMA's After-Action Report, released on July 12, 2018. *See* https://www.fema.gov/media-library-data/1531438753896-273f27679ba04c93301af90546abae18/2017FEMAHurricaneAAR.PDF. Plaintiffs are still evaluating this new information just released by FEMA. Consistent with this changing landscape, plaintiffs have been removed and added to this action. Plaintiffs amended their complaint soon as practicable.

furthered by the disparate treatment of Puerto Ricans after Hurricane Maria, as alleged in the FAC. Dkt. 28 ¶¶ 43-46, 58-63.

Based on these same facts, Plaintiffs are likely to succeed on their seventh cause of action for discrimination in disaster assistance in violation of the Stafford Act's *mandate* that relief "be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color . . . nationality . . . English proficiency, or economic status." 28 U.S.C. § 5151(a).

### B.   The Remaining Preliminary Injunction Factors Weigh Heavily In Favor Of Further Injunctive Relief.

Defendants pay short shrift to the remaining three factors, arguing only that FEMA could better serve the public by a different allocation of resources. *See* Dkt. 32 at 23. First, this is plainly false. Defendants concede that transitioning Plaintiffs from hotels to other housing options would be more cost effective. *See* Dkt. 32 at 23; Dkt. 32-1 ¶ 35.

Second, this ignores the irreparable harm Plaintiffs and the class will suffer if TSA is discontinued on July 23, 2018, as substantiated by the concurrently filed Plaintiffs' declarations. *See* Declaration of Craig J. de Recat, Exs. A-C. The TSA evacuees have not yet been able to secure alternative housing. If they take FEMA up on its offer of a one-way flight to Puerto Rico, they will have nowhere to live. Their present choice is to be homeless in Puerto Rico or homeless in the continental U.S. *See Lancor v. Lebanon Housing Auth.*, 760 F. 2d 361, 363 (1st Cir. 1985) (holding that eviction causes irreparable harm). Further, Defendants' constitutional violations, including denial of due process, meet the threshold of irreparable harm necessary to enjoin such actions. *See Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 211 (1st Cir. 1994) (finding constitutional violation sufficient to establish irreparable injury).

Third, Plaintiffs will suffer disproportionate hardship if the TSA program terminates on July 23, 2018. The irreparable harm they face in the absence of an injunction far outweighs "the

resulting drain on FEMA's resources" (Dkt. 32 at 23) if an injunction is granted. *See Lancor*, 760

F.2d at 363 (granting injunction where "harm to appellant of imminent eviction . . . in the

absence of injunctive relief outweighs the minimal harm to appellee which will result from a

preliminary injunction"). Further, the supposed resource drain is one of FEMA's own making.

FEMA argues that "[h]ousing hurricane evacuees in hotels is far more costly than providing

assistance by other means." Dkt. 32 at 23. Plaintiffs seek those other means.

      Fourth, the public interest in ensuring that funds appropriated to certain communities

(including Plaintiffs and the putative class members), as well as public interest generally in

helping provide for the overall well-being and safety of fellow citizens after a disaster, outweighs

any marginal administrative interest that Defendants may have. While Defendants submit that it

is in the public interest that "FEMA be permitted to act in accordance with its statutory mandate"

(*id.*), this mandate includes "*orderly and continuing* means of assistance," and the equitable

application of relief and assistance activities without discrimination on the grounds of race,

color, nationality, English proficiency, or economic status. *See* 28 U.S.C. §§ 5121(b), 5151(a). It

is in the public's interest that the *status quo* be maintained while this Court determines whether

Defendants have indeed acted in accordance with their statutory and constitutional mandate.

## VI.   CONCLUSION

      For each of the foregoing reasons, the Motion should be granted in its entirety.

Defendants have engaged in conduct that places Plaintiffs at risk of irreparable harm, ignoring

their mandate and choosing to expose nearly 2,000 hurricane evacuees to homelessness and other

irreparable injury. Plaintiffs respectfully ask that this Court grant the Emergency Motion and

enjoin Defendants from evicting them from their homes.

Dated:  July 18, 2018

Respectfully submitted,

By:*/s/: Craig J. de Recat*
   Craig J. de Recat
   **MANATT, PHELPS & PHILLIPS, LLP**
   Craig J. de Recat* (CA Bar No. 105567)
   Justin Jones Rodriguez* (CA Bar No.
   279080)
   Eve L. Torres* (CA Bar No. 303651)
   11355 West Olympic Boulevard
   Los Angeles, California 90064
   (310) 312-4000
   CdeRecat@manatt.com;
   JJRodriguez@manatt.com;
   ELTorres@manatt.com

   Brett Natarelli* (IL Bar No. 6297280)
   20 N. Clark Street, Suite 3300
   Chicago, Illinois 60602
   (312) 626-1813
   BNatarelli@manatt.com

   **HECTOR E. PINEIRO LAW OFFICES**
   Hector E. Piniero (BBO# 555315)
   807 Main Street
   Worcester, Massachusetts 01610
   (508) 770-0600
   hector@pineirolegal.com

   **LatinoJustice PRLDEF**
   Jose Perez* (NY Bar No. 2026649)
   Deputy General Counsel
   Natasha Bannan* (NY Bar No. 5021167)
   Associate Counsel
   99 Hudson Street, 14th Floor
   New York, New York 10013
   (212) 219-3360
   jperez@latinojustice.org;
   nbannan@latinojustice.org

   Kira Romero-Craft* (FL Bar No. 49927)
   Managing Attorney, Southeast Office
   523 West Colonial Drive
   Orlando, Florida 32804

(321) 418-6354
kromero@latinojustice.org
*Admitted Pro Hac Vice

*Attorneys for Plaintiffs*
ELIZABETH DELGADO SANTOS,
RAFAEL OCASIO BARRETO,
BETHZAIDA CRESPO VICENTE, and IRIS
OTERO, on behalf of themselves and all
similarly situated individuals

## CERTIFICATE OF SERVICE

I, Craig J. de Recat, certify that the within document, filed this 18th of July, 2018, via the

Court's electronic filing system, has thereby been served on all registered participants, and there

are no unregistered participants.

*/s/: Craig J. de Recat*
Craig J. de Recat

320601394.5